**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 15-cv-02724-CMA-MEH

THE INTELLIGENT OFFICE SYSTEM, LLC, a Colorado limited liability company,

     Plaintiff,

v.

VIRTUALINK CANADA, LTD., a Canadian corporation, and
BRIAN MONTEITH,

     Defendants.

---

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

     Before the Court is Plaintiff Intelligent Office System, LLC's (IO's) Motion for a

Preliminary Injunction.  (Doc. # 9.)  As explained in greater detail below, IO fails to show

either that (1) it would suffer irreparable harm absent the requested injunction or (2) that

the balance of the hardships weighs in its favor.  Accordingly, the Court denies the

instant Motion.

## I.  BACKGROUND[1]

     IO is a Boulder-based LLC that has developed proprietary methods for

establishing, operating, and promoting so-called "virtual" offices.  Such offices allow

---

[1] As required by Fed. R. Civ. P. 52(a)(2), the Court provides "the findings and conclusions that support" the instant Order. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1245 (10th Cir. 2001) ("Under Rule 52(a), a district court is required to make findings of fact and conclusions of law at the time it enters a preliminary injunction.").  It is worth noting that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

customers to split overhead costs by "sharing" the use of office personnel (such as receptionists or secretaries), office equipment (such as scanners, copiers, and fax machines), and office space (such as workspaces and conference rooms). (Doc. # 1, ¶ 9; Doc. # 91 at 1–2.)

On Feburary 1, 2006, IO entered into a 20-year "Master License Agreement" (MLA) with Virtualink Canada, LTD (Virtualink), a Canadian corporation. (Doc. # 9-2 at 5.) The MLA granted Virtualink the exclusive rights to use IO's trademarks and its "licensed methods" in connection with the licensing of subfranchisees throughout Canada (exclusive of Prince Edward Island). (*Id.*) In exchange for a cash payment and the right to use IO's trademarks and licensed methods, Virtualink agreed to a variety of detailed conditions, including (1) paying IO a percentage of the gross royalty receipts it collected from subfranchisees in Canada; (2) using IO's standard, form franchise agreement and adhering to IO's other standards and specifications in developing the subfranchisees; and (3) meeting and maintaining certain "sales and opening goals," which provide that a particular increasing "minimum number" of virtual office "centers" would be opened throughout the Licensed Territory in each year of the 20-year agreement (for example, Virtualink is supposed to have established nine centers in 2009, and 15 centers in 2011). (*See id.*)

Section 14.2 of the MLA contains the following language regarding termination of that agreement:

> The Licensor [IO] shall have the right to terminate all agreements, including this Agreement, between Licensor and Master Licensee [Virtualink] or its affiliates, on 30 days prior written notice, if Master

2

Licensee or its affiliates materially breach the provisions of any agreement any of them have with the Licensor.

Under circumstances where the breach is of the nature that it may be remedied through the actions of the Master Licensee, the Licensor shall permit the Master Licensee the same thirty day period to remedy any such breach or default, after which time, if the breach or default has not been remedied, the Licensor may terminate this Agreement immediately.

Notwithstanding the foregoing, if the breach is remediable, but is of a nature which cannot be reasonably remedied within such thirty day period and the Master Licensee has commenced and is continuing to make good faith efforts to remedy the breach during such thirty day period, then the Master Licensee shall be given an additional reasonable period of time to remedy the same and this Agreement shall not terminate. **Under no circumstances will the Licensor terminate the Agreement without good cause.**

(Doc. # 9-2 at 21) (emphasis added).  Section 14.3 of the MLA also provides that

Virtualink had some of the following "post-termination obligations":

Pay to the Licensor all fees, and any and all amounts or accounts payable then owed the Licensor or its affiliates pursuant to this Agreement, or pursuant to any other agreement, whether written or oral, between the parties, within fifteen days of the effective date of such termination;

Immediately cease to identify the Master License business as being, or having been, associated with the Licensor, and immediately cease using any of the Marks, or any mark in any way associated with the Licensed Methods for any purpose, except pursuant to any other effective agreement with the Licensor;

. . .

Promptly take such action as may be required to cancel all trade names or equivalent registrations relating to its use of any Marks of the Licensor or, at the option of the Licensor, assign the same to the Licensor;

Abide by the provisions related to transfer of any and all of the Master Licensee's interest under any Franchise Agreements, as set forth below and offer to the Licensor the option to take assignment of the Franchise Agreements then in effect with Franchisees in the Licensed Territory.

(*Id.* at 21–22.)

On March 12, 2013, IO sent Virtualink a letter providing a "formal notice of default of the Master License Agreement," and asserting that "IO[] has the option to terminate the Master License Agreement unless you cure the defaults described in [the attached] Schedule A to IO[]'s satisfaction within 30 days of delivery of this notice (including but not limited to taking all of the actions described in Schedule A and providing proof of compliance." (PI Hearing Ex. 22.)  Schedule A to that letter described eleven ways in which IO had purportedly defaulted, including "failing to meet and maintain the Sales and Opening goals as required by Section 5.2," and "Failing to provide reports and tax returns as required in Sections 11.1 and 11.2." (*Id.*)  On April 4, 2013, IO sent a letter asserting that Virtualink failed to comply with the MLA in providing a new subfranchisee with an agreement that "materially change[d] many of the terms of IO's required form Franchise Agreement, including waiving initial franchisee fees and royalties," and noting that such changes were not approved by IO. (Doc. # 9-4.)

On August 16, 2013, IO and Virtualink executed an Amendment to the MLA (Amendment) that, among other things, required Virtualink to develop, implement, and maintain a cloud-based, virtual "desktop" system for its subfranchisees by November 1, 2013. (Doc. # 9-5.)  The Amendment also provided that "upon a termination of the [MLA], any Franchise Agreement (and rights and obligations thereunder accruing on or after the applicable assignment date) designated at any time by [IO] will be deemed assigned to [IO] (or its designee.)" (*Id.* at 3.)

On November 6, 2013, IO sent an "Additional Notice of Default" to Virtualink, which outlined a variety of Virtualink's purported breaches of the MLA, including

Virtualink's failure to (1) use IO's standard, form franchise agreements; (2) meet the MLA's "sales and opening goals"; (3) provide "any audited financial statements as well as copies of the tax returns for all Franchisees since at least far back as 2012"; and (4) develop, implement, maintain and offer the cloud-based computing system to subfranchisees.  (Doc. # 9-6 at 3, 4).  It also stated that "Virtualink has charged, or permitted its affiliates to charge, authorized fees to its unit franchisees, [but] has not included such fees in its reports to IO of its gross revenues, and has not paid royalties to IO on all such fees."  (*Id.* at 4.)   Finally, the letter noted that "Although we may terminate now, as a continued courtesy (and not an obligation), IOS will consider providing you one more opportunity to cure all of the defaults described in [the attached] Schedule A and take other corrective action."  (*Id.* at 1.)

Between November of 2013 and October of 2015, the business relationship between IO and Virtualink continued to deteriorate.  On October 9, 2015, IO sent another letter to Virtualink, notifying it that IO was terminating the MLA.  (Doc. # 9-8.) That letter outlined the following alleged breaches of the MLA:

- **<u>Form of Franchise Agreement</u>**: "Virtualink is in breach of [its] obligation by providing unit franchise agreements that are substantially different from the Standard Form Agreement, including by extending the term of the agreement from five to ten years and by including additional franchisee obligations."  (Doc. # 9-8 at 3.)

- **<u>Development Schedule:</u>** The MLA provided that Virtualink was to have 31 centers open by June of 2013, but it only had 17 centers open as of that date.  (*Id.*)[2]

---

[2] IO's Chief Executive Officer, Ralph Gregory, admitted at the evidentiary hearing that this provision had first been breached "7 or 8" years ago.

- **"General Operations Compliance":** Virtualink has "consistently failed to follow the Operations Manual . . . [it] has consistently failed to size unit franchise offices correctly as detailed in the Operations Manual, resulting in excessively sized franchise locations in a number of instances, and by using a second company called Virtualink Properties Inc., to secure leases and build out costs as an additional source of revenue." (*Id.* at 4.)

- **Reports/tax returns:** the MLA provides that Virtualink must, within 120 days after the end of its fiscal year, provide IO with annual audited financial statements, tax returns, and a certification from an independent CPA that all sums due and owing under the MLA have been paid. "Virtualink has now been provided with over nine months to produce the documentation due to IO under the MLA, and yet has made no indication whatsoever that it is even in the process of collecting the required information." (*Id.* at 5.)

- **Compliance with the law**: Section 5.7 of the MLA provides that Virtualink must conduct itself and operate its business in compliance will all applicable laws and ordinances.  A Canadian case in the Superior Court of Ontario decided that Virtualink wrongfully terminated a franchise agreement with "ANC Business Solutions," but determined that the issue of whether Virtualink breached the Arthur Wishart Act, which requires compliance with French language laws in Quebec, should be decided at trial. (*Id.* at 6–7.)

- **Brand Protection**: The MLA provides that Virtualink must operate its business in such a manner as to not detract from or adversely reflect on the name and reputation of IO and the goodwill associated with the IO name and marks, but "In addition to legal difficulties involving rescissions, non-payment by franchisees, insufficient support for franchisees, location of franchisees and other matters, Virtualink has created adversarial relationships with several franchisees, all of which have a significant negative impact on the Intelligent Office brand.  For instance, the Scarborough franchisee has ceased paying royalties and marketing funds for the past eight months, has been operating with an unapproved technical supplier, and has raised the possibility of pursuing a rescission claim.  Virtually all of the franchisees who are involved with the unapproved technical provider are dissatisfied with Virtualink's designated vendor.  Virtualink faces continued exposure from this franchisee and yet has failed to act on August 18, 2015 notice of default and continues to allow this franchisee to act outside Intelligent Office procedures. In addition, Virtualink continues to fail to conduct itself in accordance with Intelligent Office standards, to the direct detriment of its franchisees, who are not getting the support they require." (*Id.* at 7.)

- **Cloud-based computing**:  Virtualink's failed to develop, implement and offer a cloud-based computing system to Virtualink's users by the deadline of November 1, 2013.  (*Id.* at 5–6.)

On December 16, 2015, Plaintiff brought the instant lawsuit, bringing breach of contract, breach of guaranty, and common law trademark infringement claims, and also seeking a declaratory judgment.  (Doc. # 1.)  On December 21, 2015, Plaintiff filed a Motion for a Preliminary Injunction.  (Doc. # 9.)

On February 11, 2016, the Court held a one-day evidentiary hearing on the instant Motion.  (Doc. # 34.)  At the beginning of that hearing, the Court made it abundantly clear that it was concerned about two specific weaknesses in Plaintiff's case for injunctive relief:

> The plaintiff is going to have to make a strong showing as to, one, what irreparable harm it is going to suffer that cannot be compensated by monetary damages if I deny the preliminary injunction. . . . [as well as] the balance of the hardship if I issue the preliminary injunction . . . and I essentially put the defendant out of business.[3]

## II.  ANALYSIS

### A. LEGAL STANDARD

A preliminary injunction is among the most extraordinary and drastic remedies a court can award.  *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 973, 976 (10th Cir. 2004).  To this end, a movant's right to preliminary injunctive relief must be "clear and unequivocal."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003); *see also Penn v. San Juan Hosp., Inc.*, 528 F.2d

---

[3] The official transcript of the preliminary injunction hearing has not been prepared at this juncture, so the Court has reviewed (and cites to) the "rough," instant transcript of the hearing provided by the Court's "Bridge" software.

1181, 1185 (10th Cir. 1975) (noting that a party seeking a preliminary injunction must make its case not by mere allegations, but by "clear proof"); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis added) ("a preliminary injunction . . . should not be granted unless the movant, **by a clear showing**, carries the burden of persuasion.").

To be entitled to a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, the moving party must establish that: "(1) [it] will suffer irreparable injury unless the injunction issues; (2) the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; **and** (4) there is a substantial likelihood [of success] on the merits." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (emphasis added). Additionally, "the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted). Accordingly, if a movant requests a "disfavored" preliminary injunction – that is, an injunction that "disturbs the status quo," is "mandatory as opposed to prohibitory" or "affords the movant substantially all the relief [it] may recover at the conclusion of a full trial on the merits" – the movant has an even more "heightened burden" than usual. *Ashcroft*, 389 F.3d at 975. In cases involving such injunctions, the movant must make a "**strong showing** . . . with regard to the balance of harms," and the ordinary injunction factors are "more closely scrutinized to assure that

the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* (emphasis added).

## B. APPLICATION

### 1. The "Heightened Burden" Applies, As The Requested Injunction is "Disfavored"

Plaintiff's Motion requests that the Court issue an order that (1) enjoins Defendants from using IO's trademarks and licensed methods, and (2) assigns seventeen of Virtualink's subfranchisee agreements to IO.  The Court finds that this request encompasses all three of the "disfavored" injunction categories.  First, the requested injunction would alter the status quo, which the Tenth Circuit defines as the "last peaceable uncontested status existing between the parties before the dispute developed," looking "to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (internal citation omitted).  Prior to this dispute, Virtualink was the "Master Licensee" for the seventeen Canadian franchisees and was permitted to use IO's marks, but the requested injunction would entirely upend this arrangement.  The injunction is also "mandatory," because "the requested relief 'affirmatively require[s] the nonmovant to act in a particular way," by stopping the use of IO's marks and assigning the seventeen subfranchisees, "and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the

injunction.'"[4]  *See Schrier*, 427 F.3d at 1261.  Finally, the injunction would provide

almost all of the relief Plaintiff could obtain after trial, with the exception of monetary

damages.  *See Ashcroft*, 389 F.3d at 975.

Accordingly, IO must satisfy a "heightened burden," including making a "strong

showing" as to the balance of the harms, and its request will be more "closely

scrutinized to assure that the exigencies of the case support the granting of a remedy

that is extraordinary even in the normal course."  *See Ashcroft*, 389 F.3d at 975.

### 2.  IO Cannot Establish That It Would Be Irreparably Harmed Absent the Injunction

The irreparable harm requirement is the "single most important prerequisite for

the issuance of a preliminary injunction."  *Dominion Video Satellite v. Echostar Satellite*

*Corp.*, 356 F.3d 1256, 1260–61 (10th Cir. 2004).  "[M]erely serious or substantial" harm

is not "irreparable" harm.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234,

1250 (10th Cir.2001) (quotation omitted).  Rather, to constitute irreparable harm, "an

injury must be certain, great, actual and not theoretical."  *Heideman v. South Salt Lake*

*City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal citations omitted).  Additionally, a

plaintiff can meet this requirement only by demonstrating "a **significant risk** that he or

she will experience harm that cannot be compensated after the fact by monetary

damages."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)

---

[4] At the evidentiary hearing, Plaintiff argued that the requested injunction should be characterized as prohibitory, not mandatory, because the Amendment provided that, upon termination of the MLA, the subfranchisees would be automatically assigned to IO, and the MLA's "post-termination" remedies provide that Virtualink must stop using IO's marks after termination.  The Court is not persuaded, as these remedies occur only if the MLA's termination was both effective and proper – a determination which requires a fact finder to decide, among other things, that Virtualink's purported breaches were "material" and also that its breaches were not adequately cured.

(emphasis added). "It is . . . well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm," as such losses are compensable by monetary damages. *Heideman*, 348 F.3d at 1189.

In determining whether a plaintiff has made the requisite showing of irreparable harm, the Court assesses "whether such harm is likely to occur before the district court rules on the merits." *Dominion Video Satellite*, 356 F.3d at 1260. To put it slightly differently, if a trial on the merits can be conducted before the injury would occur, there is no need for interlocutory relief. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (internal citation omitted). Additionally, a preliminary injunction is not designed to remedy past harm; rather, it protects plaintiffs from irreparable harm that will "surely result" without its issuance. *See Schrier*, 427 F.3d at 1267. In other words, speculation or unsubstantiated fear of harm that may occur in the future cannot provide the basis for a preliminary injunction. *Id.* at 1266; *see also Heideman*, 348 F.3d at 1189 (emphasis added) (to warrant a preliminary injunction, the harm must be "**of such imminence** that there is a **clear and present need** for equitable relief to **prevent irreparable harm**"); 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1 (3d ed.) (for an injunction to issue, there must be "more than an unfounded fear of imminent harm," as injunctive relief is not warranted "simply to prevent the possibility of some remote future injury.")

IO asserts that there are two sources of irreparable harm if the Court does not immediately enjoin Defendants in the instant case. First, IO claims that unless the seventeen Canadian franchisees are assigned to it before a trial occurs on the merits, "it

is likely that the Canadian franchise system **will disband or, alternatively, morph** into a system that does not adhere to the licensed methods," because (a) Virtualink does not currently have the infrastructure to properly "support" the Canadian Franchise system, (b) various Canadian vendors and creditors claim that Virtualink owes them money, which damages the IO brand, and (c) absent the assignment, IO "has no way to assure the Licensed Methods are being adhered to."  (Doc. # 9 at 7–8) (emphasis added). Second, IO argues that the damage to its brand and reputation caused by Virtualink's trademark infringement (infringement which is currently occurring, in its view, given its termination of the MLA), constitutes irreparable injury.  (*Id.* at 10.) [5]

However, IO offered **no evidence**, much less made a "clear and unequivocal" showing, that the Court must act **now** to prevent an "imminent" harm that is "certain, great, actual and not theoretical."  *See Heideman*, 348 F.3d at 1189; *Flowers*, 321 F.3d at 1256.  To the contrary, IO's evidence indicates that the larger harms it alleges are neither "certain" nor "imminent," as IO has long been complaining – since at least the spring of 2013 – about precisely the same issues with Virtualink's conduct which it now claims will bring about the end of the Canadian system and irreparably damage its brand.  Moreover, although IO's Chief Executive Officer Ralph Gregory testified at the

---

[5] Plaintiff also argues that, in light of its termination of the MLA, Virtualink no longer has the legal authority to make subfranchisee sales, and "[t]his fact can lead to two unacceptable results: (1) sub-franchise sales cease in Canada pending trial; or (2) sub-franchise sales continue in Canada pending trial by an entity not authorized to sell sub-franchises potentially subjecting all such sales to rescission."  (Doc. # 9 at 7.)  Not only is this speculation about the "potential" of rescission insufficient to show irreparable harm, it was IO's choice to terminate the MLA, and even assuming, *arguendo*, that it will ultimately prevail at trial on its breach of contract claims, a party may not satisfy the irreparable harm requirement if the alleged harm is self-inflicted.  *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We [do] not consider a self-inflicted harm to be irreparable [injury]"); 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1 (3d ed.) (same).

evidentiary hearing, his testimony amounted to little more than conclusory speculation about future harms.  In one characteristic example, Mr. Gregory was asked, "So if we have a trial in 2017 and you are awarded the Canadian system through the assignment of the franchise agreements . . . what is your concern of what will happen between now and then?"  He responded, "That we have critical permanently crippled franchisees. You know, folks that are in the Intelligent Office business, but they have been hamstrung out of the gate.  It is a problem."  Unfortunately for IO, this kind of speculative and conclusory evidence cannot show irreparable injury.  *See SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991) ("[Plaintiff] offers only generalities and business speculation to establish its irreparable injury, and its evidence falls far short of the proof that is required to make a clear showing of irreparable injury."); *see also Schrier*, 427 F.3d at 1266 (speculation or unsubstantiated fear of harm that may occur in the future cannot provide the basis for a preliminary injunction).

Another way of conceptualizing this problem is to consider that most of the evidence of Virtualink's purported breaches of the MLA – from its failure to use form franchise agreements to its failure to provide audited tax returns – is pertinent to **past** injuries to IO, which may well be compensable with monetary damages after trial; however, injunctive relief is not designed to remedy **past** injuries.  In *GTE Corp. v. Williams,* 731 F.2d 676 (10th Cir. 1984), a trademark case, the Tenth Circuit held that a plaintiff did not show irreparable harm justifying preliminary injunctive relief because "[a]ny injury that [Plaintiff] would suffer before trial on the merits **would be a relatively short extension of the injury that [it] knowingly suffered for three years before it**

**filed suit.**" *Id.* at 679 (emphasis added).  The court noted that "Most of the advantage from [defendant's] use of the name 'General Telephone' has already accrued to [defendant], and control of the quality of the products and services sold under the name 'General Telephone' . . . has long been in [defendant's] hands.  The harm to [plaintiff] and the public 'cannot be materially aggravated or extended in the interim.'" *Id.* Similarly, in the instant case, IO's name and the control of the quality of the services sold under that name has been in Virtualink's hands since 2006, and it is undisputed that most of the issues between the parties have long been known to IO (such that IO has been "knowingly suffering" these same harms for years).  However, IO offers no **evidence** that the relatively short delay before trial would **materially worsen** the current situation, i.e., that the harm would "materially aggravated or extended" between the present moment and a trial on the merits.

Indeed, the Court's determination that IO has failed to demonstrate irreparable harm absent injunctive relief is further bolstered by IO's own significant delay in seeking that relief.  "[D]elay in seeking preliminary relief cuts against finding irreparable injury." *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social and Rehabilitation Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (citing *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984)) ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.").  In the trademark infringement context in particular, although irreparable injury is ordinarily presumed once the plaintiff has established a likelihood of confusion, *see Amoco Oil Co. v.*

14

*Rainbow Snow, Inc.*, 809 F.2d 656 (10th Cir. 1987), the Tenth Circuit has significantly

cabined this presumption in the face of delay by a movant.  Specifically, "[d]elay in

seeking relief . . . **undercuts any presumption that infringement alone has caused**

**irreparable harm** *pendente lite*; therefore such delay may justify denial of a

preliminary injunction for trademark infringement."  *GTE Corp.*, 731 F.2d at 678 (internal

citation omitted, emphasis added); s*ee also Kingsford Products Co. v. Kingsfords, Inc.*,

674 F. Supp. 1428, 1431 (D. Kan. 1987) (citing *GTE Corp.*, 731 F.2d at 678) ("The

plaintiff has waited nearly 8 months before seeking any relief.  Delay of this nature

undercuts the sense of urgency that ordinarily accompanies a motion for preliminary

relief and suggests there is, in fact, no irreparable injury.")  Whether IO's delay is

measured from the point of IO's notice of default (which it sent almost three full years

prior before the instant Motion was filed, and which explicitly threatened termination of

the MLA), or the IO's final notice of termination (which it sent approximately four months

before the instant Motion was filed), it is clear that IO's delay in requesting this

injunction also indicates that IO would not suffer irreparable harm absent injunctive

relief.

### 3.  IO Also Cannot Establish That The Balance of the Equities Weighs in its Favor

In light of IO's failure to establish that irreparable harm will occur absent

injunctive relief, this Court need not analyze the remaining three equitable factors.

Nevertheless, in abundance of caution, the Court also determines that IO has failed to

make the heightened "strong showing" that threatened injury to the movant outweighs

the injury to the other party under the preliminary injunction.  *See Ashcroft*, 389 F.3d at 975.

Virtualink's COO, John Loewen, testified that an injunction from this Court would be the "death knell" of Virtualink's business and that all three of its employees would be terminated.  Although IO's counsel **speculated** that Virtualink could simply be returned to its master franchisee status if it is later determined that an injunction was wrongly entered, it presented no **evidence** that this was a realistic prospect, nor that a "return" could outweigh losses to Virtualink (monetary or otherwise) in the interim.  In contrast, Mr. Loewen specifically testified that "in practice," such a return to master franchisee status would be impossible.  Specifically, he explained that Virtualink would face a serious loss of subfranchisee goodwill it could not salvage, as the virtual office business "is a relationship-based business. . . . And to see a revolving door of franchisors would create anything but a positive relationship."  Mr. Loewen also testified that currently, IO is accepting royalty payments from Virtualink and otherwise proceeding as usual, despite the purported termination of the MLA.

The Court agrees with Defendant that the harms to Virtualink, which are almost certain to occur – at worst, the total end of its business and the termination of all of its employees, and at best, the loss of goodwill that would invariably ensue if subfranchisees were wrongly assigned to IO – do outweigh the harms that IO speculates might possibly ensue in the absence of this injunction, particularly because, under the status quo, IO is currently receiving royalty payments from Virtualink.  In sum, IO has not shown that the balance of the equities lies in its favor.

### III.  **CONCLUSION**

For the aforementioned reasons, Plaintiff Intelligent Office System, LLC's Motion

for a Preliminary Injunction (Doc. # 9) is hereby DENIED.  It is FURTHER ORDERED

that this matter may be set for an expedited trial; the parties should confer among

themselves and email chambers jointly to request a trial setting

(arguello_chambers@cod.uscourts.gov), as described in CMA Civ. Practice Standard

1.2(a).

DATE:  February 18, 2016

BY THE COURT:

United States District Judge